1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

JOE LEWIS MARTINEZ,                                   No. 2:13-cv-0003 GGH

12

            Petitioner,

13

        v.                                            ORDER

14

CALIFORNIA DEPARTMENT OF
CORRECTIONS,

15

16

            Respondent.

17

18

Petitioner is a parolee proceeding pro se with a petition for a writ of habeas corpus

19

pursuant to 28 U.S.C. § 2254.  Petitioner challenges the constitutionality of his 2010 conviction

20

and resulting sentence for rape of an intoxicated person (Cal. Penal Code § 261(a)(3)).

21

Petitioner contends that the trial court violated his constitutional rights because insufficient

22

evidence supported his conviction in violation of the Fourteenth Amendment and that, in two

23

regards, he received ineffective assistance of counsel in violation of the Sixth Amendment.  Upon

24

careful consideration of the record and the applicable law, and for the reasons set forth below, the

25

undersigned recommends that petitioner's application for habeas corpus relief be denied.

26

**I. Procedural Background**

27

On February 5, 2010, petitioner was convicted of rape of an unconscious person (Cal.

28

Penal Code § 261(a)(4)) and rape of an intoxicated person (Cal. Penal Code § 261(a)(3)).  Lod.

1   Doc. 1, 188.  Petitioner was sentenced to state prison for six years on each count.  Id.  Petitioner

2   appealed his sentence to the California Court of Appeal, Third Appellate District.  Lod. Doc. 5.

3   On July 20, 2011, the California Court of Appeal affirmed but modified the judgment by vacating

4   the sentence for and dismissing the count of rape of an unconscious person (Cal. Penal Code §

5   261(a)(4)).  ECF No. 12, 27-32.  Petitioner filed a petition for review, which the California

6   Supreme Court denied on September 28, 2011.  Lod. Docs. 10-11.

7        On October 5, 2012, petitioner filed a petition for writ of habeas corpus in the Sacramento

8   County Superior Court.  Lod. Doc. 12.  On October 24, 2012, the petition was denied.  Lod. Doc.

9   13.  On October 25, 2012, petitioner filed a motion for reconsideration.  Lod. Doc. 14.  On

10   November 7, 2012, the court stayed further action in petitioner's case, pending the outcome of

11   other cases raising similar issues.  Lod. Doc. 15.  Petitioner did not seek further review of his

12   state collateral proceedings.

13        On January 2, 2013, petitioner filed his federal habeas corpus petition.  ECF No. 1.

14   **II.  Factual Background**

15        The facts of the case were summarized by the California Court of Appeal as follows[1]:

16
17   > In January 2009, the 22-year-old victim moved to Sacramento to complete an internship offered through her college.  The university arranged for the victim to live with three women in an apartment at a complex located in Natomas.  About a week after the victim moved in, she met the 26-year-old defendant at the complex gym.  Defendant lived in the complex with his mother.  The victim thought defendant was nice, but she had a boyfriend and tried to avoid defendant.  After running into defendant a number of times, the victim exchanged phone numbers with him.  They quickly became friends and visited at their respective apartments.  The victim met defendant's mother.  Defendant told the victim that he had children and asked if the victim had any.  She explained that she was a virgin and was saving herself for marriage.
18
19
20
21
22

23   > On January 20, 2009, the victim invited defendant to a party at her apartment.  Later, at defendant's apartment, they kissed for the first time.  Defendant wanted oral sex but she refused.  Defendant digitally penetrated her vagina but when he tried to take off her shorts, she said "no" and he stopped.
24
25

26   > The next day, defendant ignored the victim; she felt used.  The

27
28   [1]    This factual background is taken from the unpublished opinion of the California Court of Appeal, Third Appellate District, and is presumed correct.  See 28 U.S.C. § 2254(e)(1).

victim suggested they not contact one another.

On January 22, 2009, defendant was very apologetic.  The victim agreed to remain friends.

One night, defendant took her to a bar located in Natomas.  They had a drink and then returned to his apartment.  They kissed and defendant performed oral sex on the victim.  Then the victim decided to leave, explaining she just wanted to be friends.  Angry, defendant called her by his former girlfriend's name and accused the victim of "cheating on him" and sleeping with other men.  Defendant invited the victim to join him in self-mutilation by cutting.  The victim stayed until defendant calmed down and then she left.  The next day, the victim told defendant that she did not want to talk to him anymore.

The victim explained to the jury that she was not an experienced drinker, having been drinking for only a year and even then, had not engaged in a lot of drinking.  At some point, she had mentioned to defendant that the only times he tried anything was after they had been drinking and she could not understand why.  The victim returned to her college town for a few days and learned that her boyfriend had been seeing other women.  The victim returned to Sacramento on January 31, 2009.  That evening or very soon thereafter, defendant made dinner for her and they talked.  The victim told defendant about her boyfriend's behavior and that she did not think it was a good idea to have a physical relationship with defendant, explaining that she just wanted to be friends.  The victim believed that defendant respected her wish to be just friends because they continued to be friendly and there was no physical contact.

About 8:00 p.m. on Friday, February 6, 2009, the victim got off work early.  She planned an evening out with her roommates and had one beer at home with one of her roommates.  The victim's roommates then changed their minds about going out.  Defendant sent the victim text messages and offered to take her out and she agreed.  She explained to defendant that they were going out as friends and defendant stated he knew.  They went to the Press Club.  Defendant bought her a Long Island Iced Tea and he had a beer.  He did not finish his beer because he "was driving."  After she finished her Long Island, defendant had her finish his beer.  She went to the women's restroom.  She apparently took too long because defendant was angry when she came out. She kissed him on the cheek to calm him down and received a hug from him.  Defendant bought the victim another Long Island.  When she finished it, she felt "really drunk" and "could barely walk."  She slipped and fell, hurting her knee.  A bouncer helped her to a couch.  Her knee really hurt and she could "barely keep [her] eyes open," having never previously been that intoxicated.

About 10:30 a.m. on February 7, 2009, the victim woke up.  She was in defendant's bed.  The victim testified that she blacked out and did not remember anything after being placed on the couch in the bar.  She did not remember leaving the club, getting into the car,

the drive home, or how she got inside defendant's bedroom. She did not want to go to defendant's apartment. She discovered that she was naked from the waist down, that her dress and shirt had been pulled down, and that her bra was undone. She found a dried, white, crusty substance on her mouth. She "freak[ed] out" and asked defendant repeatedly if he had had sexual intercourse with her. After denying it four or five times, defendant finally admitted they had had sex. The victim started crying and defendant laughed, saying that he was just joking. She wanted to know the truth. He confirmed that he had sexual intercourse with her but he did not want her to be mad.

The victim denied that she ever consented to sexual intercourse with defendant that night, denied rubbing his groin at the Press Club, and denied referring to him there as her "boyfriend." She did not recall removing her clothing or defendant removing them for her or having sexual intercourse with him. She did not recall smiling at defendant in his bedroom and had no recollection of a condom on defendant or her helping him remove it. The victim explained she would never have removed a condom in any event because she was not using birth control and was also concerned about sexually transmitted diseases.

The victim left defendant's apartment crying and feeling upset. She had to be at work that day at 11:00 a.m. She returned to her apartment, changed her clothes and went to work. When her coworkers saw that she was upset, they asked what was wrong. The victim lied and told them that she had "broken up" with her boyfriend. At one point, the victim vomited in the restroom.

After work, the victim went to the UC Davis Medical Center and reported that she had been raped. An officer was called and a sexual assault exam was conducted by a nurse practitioner.

Sacramento Police Officer Roderick Byron responded to the medical center that night and interviewed the victim for 30 to 45 minutes. The victim's report of the incident was consistent with her trial testimony. Officer Byron had the victim call defendant and the call was tape-recorded. Defendant admitted having had sexual intercourse with the victim, apologized, and said he felt "terrible." During this conversation, defendant claimed he wore a condom but that she pulled it off. When the victim asked defendant why he did not wait until she wanted sex and was sober, defendant responded that he could not "really ever see that happening."

Nurse Practitioner Elaine Green conducted the forensic examination. The victim provided a history that was consistent with her trial testimony. Crying, the victim told Green that she (the victim) could not remember anything from the time she was helped to a couch in a bar until she woke up in defendant's bed the next morning. Green noted abrasions on the victim's knee and lower lip and a small tear on her anal opening. The victim complained of vaginal pain but did not recall engaging in any sexual acts. Green found seminal fluid on the victim's left forearm and non-motile sperm in the victim's vagina. Green opined that her findings were

consistent with the victim's report.

On February 12, 2009, Sacramento Sexual Assault Detective Chris Bernacchi met with the victim to take her complete statement. Her statement was consistent with her trial testimony. Detective Bernacchi had the victim make a "pretext" call to defendant that was tape-recorded. The victim asked defendant why he thought sex was permissible when she had clearly stated that she wanted no physical contact. Defendant responded, "Nothing made [him] feel like it was okay." Defendant also responded, "I don't know" and then said, "I don't think it's okay" and "I don't know why I did it." The victim repeatedly stated that he had raped her while she was "unconscious" and defendant simply responded "I'm sorry" and that he felt "terrible every day of [his] life" and that he had made "a bad choice the other night."

On March 19, 2009, Detective Bernacchi interviewed defendant over the phone and tape-recorded the conversation. Defendant claimed he and the victim were intoxicated and that he believed the sex was consensual. Defendant claimed that at the bar, the victim called him her "boyfriend" and groped him. He denied that he tried to get the victim drunk. He admitted that when they got to his apartment, the victim appeared to have passed out but he claimed that he thought she was "just playin' games" or "pretending to be asleep" because "she was like . . . cracking like these little smiles." When he pulled on her stockings, she said, "no, Joe, no," while at the same time cracking smiles, positioning her body in an inviting manner, and responding favorably to his actions. He removed her clothes, not she, and admitted that she said "no." He claimed he only had vaginal intercourse with her. He did not know whether the victim was drunk but admitted that she never verbally consented to sexual intercourse. When Detective Bernacchi asked defendant how he felt about the victim's accusation that he had raped her, defendant responded, "Yeah. I uh—well, I uh—I—I do almost feel, you know, by definition, I mean, yeah, I feel like that's pretty much what I did." When Detective Bernacchi advised that the district attorney's office would decide whether to bring criminal charges, defendant responded, "I—I can definitely see them filing charges. I mean I was honest and yeah, I mean I fuckin' raped her, dude, you know what I mean? Like, down to definition. . . ."

Defendant did not testify at trial. His mother testified that she heard defendant and the victim return about 1:00 a.m. Later, the mother heard soft giggling and a moan and also saw the victim walk to the hall bathroom without stumbling or tripping. The mother heard the victim leave the next morning and there had been no raised voices.

People v. Martinez, 2011 WL 2892002, *1-4 (Cal.App.3rd 2011); ECF No. 12, 27-29.

## III. Analysis

Petitioner seeks a writ of habeas corpus on three grounds. He argues that the trial court violated his Fourteenth Amendment rights because insufficient evidence supported his conviction.

5

1    Petitioner also makes two arguments that he received ineffective assistance of counsel in violation

2    of the Sixth Amendment.  Only one of petitioner's ineffective assistance claims was presented to

3    the California Supreme Court on direct appeal.  That claim states that petitioner's right to

4    effective assistance of counsel was violated because his trial counsel failed to move to exclude

5    Detective Chris Bernacchi's statement made during a conversation with petitioner regarding the

6    actions and abilities of intoxicated persons.  The other claim, which was not presented on direct

7    appeal, is that his trial counsel was biased because he formerly worked as a prosecutor, creating

8    an impermissible conflict of interest.

9        **A.  Standards for a Writ of Habeas Corpus**

10        The statutory limitations of federal courts' power to issue habeas corpus relief for persons

11    in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

12    Death Penalty Act of 1996 (AEDPA).  An application for a writ of habeas corpus can be granted

13    only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A

14    federal writ is not available for alleged error in the interpretation or application of state law.  See

15    Wilson v. Corcoran, ___U.S.___, 131 S. Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-

16    68, 112 S.Ct. 475 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

17        Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

18    corpus relief:

19
20
21        An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

22
23        (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

24
25        (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

26        As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

27    2254(d) does not require a state court to give reasons before its decision can be deemed to have

28    been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

1   Rather, "when a federal claim has been presented to a state court and the state court has denied

2   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

3   of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris

4   v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when

5   it is unclear whether a decision appearing to rest on federal grounds was decided on another

6   basis). "The presumption may be overcome when there is reason to think some other explanation

7   for the state court's decision is more likely." Id. at 785.

8          The Supreme Court has set forth the operative standard for federal habeas review of state

9   court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable*

10  application of federal law is different from an incorrect application of federal law.'" Harrington,

11  131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000). "A state

12  court's determination that a claim lacks merit precludes federal habeas relief so long as

13  'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786,

14  citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004). Accordingly, "a

15  habeas court must determine what arguments or theories supported or . . . could have supported[]

16  the state court's decision; and then it must ask whether it is possible fairminded jurists could

17  disagree that those arguments or theories are inconsistent with the holding in a prior decision of

18  this Court." Id. "Evaluating whether a rule application was unreasonable requires considering

19  the rule's specificity. The more general the rule, the more leeway courts have in reaching

20  outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard,

21  which "stops short of imposing a complete bar of federal court relitigation of claims already

22  rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case

23  for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing

24  Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

25         The undersigned also finds that the same deference is paid to the factual determinations of

26  state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

27  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

28  decision that was based on an unreasonable determination of the facts in light of the evidence

1   presented in the state court proceeding." It makes no sense to interpret "unreasonable" in §

2   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

3   factual error must be so apparent that "fairminded jurists" examining the same record could not

4   abide by the state court factual determination. A petitioner must show clearly and convincingly

5   that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

6   969, 974 (2006).

7   　　　The habeas corpus petitioner bears the burden of demonstrating the objectively

8   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

9   Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002). Specifically, the petitioner "must

10   show that the state court's ruling on the claim being presented in federal court was so lacking in

11   justification that there was an error well understood and comprehended in existing law beyond

12   any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-787. "Clearly

13   established" law is law that has been "squarely addressed" by the United States Supreme Court.

14   Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008). Thus, extrapolations of

15   settled law to unique situations will not qualify as clearly established. See e.g., Carey v.

16   Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006). The established Supreme Court

17   authority reviewed must be a pronouncement on constitutional principles, or other controlling

18   federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.

19   Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

20   　　　The state courts need not have cited to federal authority, or even have indicated awareness

21   of federal authority in arriving at their decision. Early, 537 U.S. at 8, 123 S. Ct. at 365. Where

22   the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

23   federal court will independently review the record in adjudication of that issue. "Independent

24   review of the record is not de novo review of the constitutional issue, but rather, the only method

25   by which we can determine whether a silent state court decision is objectively unreasonable."

26   Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

27   　　　Finally, if the state courts have not adjudicated the merits of the federal issue, no

28   AEDPA deference is given; the issue is reviewed de novo under general principles of federal law.

1    Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011).

2    **A. Insufficient Evidence Claim**

3         Petitioner argues that there was "no factual or sufficient evidence to show that he knew or

4    should have known that [the victim] was too intoxicated to resist or give consent at the moment in

5    time [they] had sexual intercourse." ECF No. 1, 5.  When a petitioner challenges his

6    incarceration on the ground that the evidence was insufficient to support his conviction, "the

7    relevant question is whether, after viewing the evidence in the light most favorable to the

8    prosecution, any rational trier of fact could have found the essential elements of the crime beyond

9    a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979).  The

10   essential, substantive elements of the criminal offense are defined by state law. Id. at 324 n. 16;

11   accord, Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004).  Jackson established a two-step

12   inquiry for considering a challenge to a conviction based on sufficiency of the evidence.  U.S. v.

13   Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

14        First, the court considers the evidence adduced at trial in the light most favorable to the

15   prosecution.  Id., citing Jackson, 443 U.S. at 319.  "'[W]hen faced with a record of historical facts

16   that supports conflicting inferences," the court "must presume—even if it does not affirmatively

17   appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution,

18   and must defer to that resolution.'"  Id., quoting Jackson, 443 U.S. at 326.

19        "Second, after viewing the evidence in the light most favorable to the prosecution, a

20   reviewing court must determine whether this evidence, so viewed is adequate to allow 'any

21   rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'"  Id.,

22   quoting Jackson, 443 U.S. at 319.  "At this second step, we must reverse the verdict if the

23   evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would

24   have to conclude that the evidence of guilt fails to establish every element of the crime beyond a

25   reasonable doubt." Id.

26        Superimposed on these already stringent insufficiency standards is the AEDPA

27   requirement that even if a federal court were to initially find on its own that no reasonable jury

28   should have arrived at its conclusion, the federal court must also determine that the state appellate

1    court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable

2    determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

3          On direct appeal, the California Court of Appeal noted and rejected Petitioner's claim as

4    follows:

> Defendant contends insufficient evidence supports his convictions. Because rape of an unconscious woman (count one) will be dismissed, we need only consider whether sufficient evidence supports defendant's conviction for rape of an intoxicated woman (count two).   We conclude overwhelming evidence supports defendant's conviction.
>
> For rape of an intoxicated woman, the prosecution must prove that "1. The defendant had sexual intercourse with a woman; [¶] 2. He and the woman were not married to each other at the time of the intercourse; [¶] 3. The effect of an intoxicating substance prevented the woman from resisting; AND [¶] 4. The defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting. [¶] . . . [¶]  A person is prevented from resisting if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences.    Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved. [¶] . . . The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting. . . ." (CALCRIM No. 1002, italics omitted.)
>
> "[S]ection 261[, subdivision] (a)(3) proscribes sexual intercourse with a person who is not capable of giving legal consent because of intoxication.   [And,] the issue is not whether the victim actually consented to sexual intercourse, but whether he or she was capable of exercising the degree of judgment a person must have in order to give legally cognizable consent."   (People v. Giardino (2000) 82 Cal.App.4th 454, 462 (Giardino).)
>
> "In deciding whether the level of the victim's intoxication deprived the victim of legal capacity, the jury shall consider all the circumstances, including the victim's age and maturity.  [Citation.] It is not enough that the victim was intoxicated to some degree, or that the intoxication reduced the victim's sexual inhibitions. 'Impaired mentality may exist and yet the individual may be able to exercise reasonable judgment with respect to the particular matter presented to his or her mind.'  [Citations.]  Instead, the level of intoxication and the resulting mental impairment must have been so great that the victim could no longer exercise reasonable judgment concerning that issue.  (Giardino, supra, 82 Cal.App.4th at pp. 466-467.)

10

Here, the victim testified that she drank a beer at her apartment and then went out to a club with defendant where she consumed two Long Island drinks and part of defendant's beer. She fell at the club, hurt her knee, and was helped to a couch. That was the last thing she remembered until she awoke the next morning in defendant's bed. She testified that she had never been that intoxicated before, having been barely able to walk. She also testified that she was an inexperienced drinker, being only 22 years of age. When she awoke in defendant's bed, she was naked from the waist down. Although defendant initially denied several times that they had had sexual intercourse, he finally admitted that they had. Thereafter, in two pretext calls and in an interview with a detective, defendant admitted the act of sexual intercourse. In his interview with the detective, defendant admitted that the victim appeared to have passed out but he believed she was faking. He also admitted that he removed her clothing despite her saying "no." He also admitted that the victim never consented to sexual intercourse. He claimed that she was moving and making noise but did not claim she was able to carry on a coherent conversation. When asked how he felt about the victim's accusation that he raped her, defendant never denied it and stated that, "by definition, I mean, yeah, I feel like that's pretty much what I did." And when told that the prosecutor would decide whether to bring charges, defendant stated that he believed he could be charged because he "fuckin' raped" the victim.

Overwhelming evidence supports his conviction for rape of an intoxicated woman. (People v. Johnson (1980) 26 Cal.3d 557, 578 [court reviews the whole record in light most favorable to the judgment for substantial evidence].)

Martinez, 2011 WL 2892002 at *4-5; ECF No. 12, 30-31.

Petitioner's insufficient evidence argument relates to the third and fourth prongs of the test for rape of an intoxicated woman. Petitioner claims that the people failed to carry its burden of proof because there was insufficient evidence to prove beyond a reasonable doubt that the victim was too intoxicated to resist or give consent when they had intercourse—the third prong—and, that he knew or reasonably should have known the victim was too intoxicated to resist or give consent when they had intercourse —the fourth prong. ECF No. 1, 5. He states that there is no factual evidence or expert testimony supporting the finding that the victim was too intoxicated to consent. Id. He also asserts that the Court of Appeal did not properly capture statements he made denying "the false accusation" and instead the court took his statements out of context. Id. at 6, 8.

However, petitioner primarily relies on the arguments raised on direct appeal to the California Supreme Court, appending a copy of his opening brief to the instant petition. ECF No.

1   1, 16-26; Lod. Doc. No. 10.  In this brief, petitioner contends that the victim frequently drank

2   three or more alcoholic beverages, she drank enough prior to the incident for things to become

3   blurry with periods of forgetfulness, she was not an underage teen or inexperienced drinker, and

4   there was no evidence that she had to be carried away from the bar or into petitioner's apartment.

5   Lod. Doc. No. 10, 5-6.  Petitioner claims that the victim's slipping while at the bar does not

6   indicate her level of intoxication, that she had slurred speech, or that she was otherwise unsteady

7   on her feet.  Id. at 6.  Furthermore, petitioner states that no witnesses from the bar were called to

8   testify, no experts were called to testify about the amount of alcohol the victim consumed, and no

9   experts were called to testify about how alcohol may have affected her ability to resist petitioner's

10  overtures given her age, physical characteristics, and tolerance to alcohol.  Id.  Furthermore,

11  petitioner asserts that he had an honest and reasonable belief that the victim was not too

12  intoxicated to give legal consent to sexual intercourse, which is a defense to rape by intoxication.

13  Id.; People v. Giardino, 82 Cal.App.4th 454, 328 (2000).

14         Petitioner also attached a letter to the instant petition in which he makes numerous

15  contentions.  ECF No. 1-1.  In this letter, petitioner states that the victim initiated the sexual

16  conduct and enticed him to have sex with her, that her statements are contradictory and

17  unreliable, and that she had full awareness and comprehension of her actions.  Id.  Petitioner

18  explains that during the arranged phone calls between himself and the victim he told her that he

19  did not rape her and told Detective Bernacchi that she consented.  Id.

20         In essence, petitioner requests that his letter be utilized as evidence to counteract that

21  produced in his state trial, and subsequent state proceedings.  This expansion of the record is not

22  permitted here.  See Henry v. Ryan, 720 F.3d 1073, 1093 (n.15) (9th Cir. 2013).

23         Petitioner is correct that the prosecution must prove every element of a crime beyond a

24  reasonable doubt to a jury.  It is the prosecution's burden to prove all elements of a charged

25  offense.  Sullivan v. Louisiana, 508 U.S. 275, 277–278, 113 S. Ct. 2078 (1993), citing Patterson

26  v. New York, 432 U.S. 197, 210, 97 S. Ct. 2319 (1977).  The Due Process Clause of the

27  Fourteenth Amendment "protects the accused against conviction except upon proof beyond a

28  reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re

1    *Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068 (1970).  However, the relevant question here is not

2    whether this court is convinced beyond a reasonable doubt that petitioner committed the crime, or

3    whether the people proved every element of the crime beyond a reasonable doubt at petitioner's

4    trial.  This Court is tasked with determining whether any rational trier of fact could have been

5    persuaded beyond a reasonable doubt that the effect of an intoxicating substance prevented the

6    victim from resisting and petitioner knew or reasonably should have known that the effect of an

7    intoxicating substance prevented the woman from resisting.

8         This court has independently reviewed the transcripts and record of the proceedings

9    leading to petitioner's conviction and finds that sufficient evidence was presented to support the

10   jury's findings and verdict.  There was sufficient evidence introduced at trial, which was

11   summarized by the Court of Appeal, from which a rational juror could have found that petitioner

12   committed a rape of an intoxicated person, and ultimately, that the state appellate court was not

13   AEDPA unreasonable in its assessment that sufficient evidence existed.[2]

14        In regards to the third prong of the test for rape of an intoxicated woman, there was ample

15   evidence supporting the jury's finding that the effect of an intoxicating substance prevented the

16   victim from resisting.  As discussed by the Court of Appeals, the victim was prevented from

17   resisting if she was so intoxicated that she could not give legal consent, which required the ability

18   to exercise reasonable judgment.  The exercise of reasonable judgment requires the ability "to

19   understand and weigh the physical nature of the act, its moral character, and probable

20   consequences."  *People v. Smith*, 191 Cal.App.4th 199, 205 (2010).

21        Petitioner admitted to Detective Bernacchi that both he and the victim were drunk but that

22   she was more inebriated.  Lod. Doc. No. 1, 77, 81.  He stated that she finished over half of his 22

23   ounce Miller Genuine Draft beer and they both had two Long Island Ice Teas.  *Id.* at 83-84.  At

24   trial, the parties stipulated that one Long Island Ice Tea "is usually the equivalent of

25   approximately four beers, depending on many factors such as weight and age and bartender."

26   _____

27   [2] The undersigned understands that he is not to assess the error independently, and then determine
     if any error found was "unreasonable."  <u>See</u> Lockyer v. Andrade, 538 U.S. 63, 71, 123 S. Ct. 1166
     (2003).  However, other than simply uttering a conclusion, it is difficult to discuss

28   "unreasonableness" in any analysis without discussing the analysis in depth.

Lod. Doc. No. 2, 288. Thus, the victim consumed the equivalent of about 9 beers in a relatively short period of time.[3] Furthermore, petitioner acknowledged that the victim fell while dancing with him and that she required assistance getting up and to a couch after the fall. Lod. Doc. No. 1, 84-85. Petitioner also stated that the victim passed out in his room when they got back to his apartment. Id. at 77, 81. This evidence of the victim's rate and amount of alcohol consumption, along with the fact that she fell and passed out, provides strong evidence that she was intoxicated.

Also, the victim testified that she told petitioner numerous times that she was a virgin and that she did not want to have sex until she was married. See Lod. Doc. No. 2, 54-56. The victim also discussed her sexual morality with petitioner during the first pretext call. Lod. Doc. No. 1, 66-67. This evidence runs counter to petitioner's claim that the victim initiated the sexual conduct and enticed him to have sex with her. It also indicates that the victim did not have the ability to understand and weigh the physical nature and moral character of having sexual intercourse on the night in question.

Based on the weight of this evidence, there is simply no room to find that the appellate court was unreasonable in its determination that a rational trier of fact surely could be persuaded beyond a reasonable doubt that the effect of roughly 9 beers consumed in a short period of time prevented the victim from exercising reasonable judgment in regard to her virginity. Thus, petitioner's claim that there was insufficient evidence to prove beyond a reasonable doubt that the victim was too intoxicated to resist or give consent when they had intercourse must fail.

Turning to the fourth prong of the test for rape of an intoxicated woman, petitioner argues that he did not know the victim was too intoxicated to give legal consent and that an honest and reasonable but mistaken belief that the victim was able to consent is a defense to rape by intoxication. People v. Giardino, 82 Cal.App.4th 454, 472 (2000). Regardless of petitioner's assertions, the state appellate court found that there was sufficient evidence adduced at trial by which a rational trier of fact could be persuaded beyond a reasonable doubt that even if petitioner believed the victim was able to consent, it was not a reasonable belief. The state court was

---

[3] The victim testified that she arrived at the bar with petitioner around 11:00 p.m. but that she was not clear how long they stayed at the bar. Lod. Doc. No. 2, 66, 71.

1  clearly not AEDPA unreasonable.

2        First, petitioner made several statements to Detective Bernacchi concerning the victim's

3  level of intoxication and his belief that he committed rape.  Petitioner argues that these statements

4  were not properly addressed and were taken out of context by the Court of Appeals.  While this

5  Court considers these statements along with earlier conversations petitioner had with the victim[4],

6  they still support a finding that petitioner knew or should have known that due to her level of

7  intoxication the victim was unable to resist and give legal consent to sexual intercourse.

8        In the initial pretext call with the victim, petitioner told the victim "it seemed like you

9  were okay with it" and that she was conscious.  Lod. Doc. No. 1, 65.  After the victim told

10  petitioner how drunk she had been, petitioner said "that's not good, I don't want you getting that

11  drunk anymore.  At least not with me then."  Id.  Petitioner later stated that they had the same

12  amount of alcohol, three or four drinks each, and that he finished her drinks.  Id. at 66.  Also, after

13  the victim asked whether petitioner had sex with her because she was drunk, he responded saying

14  "No, no.  Because I love you."  Id. at 67.  In the second pretext call, when the victim told

15  petitioner that he raped her, to which he responded saying "Oh, my god, don't say that please.

16  Please don't say that."  Id. at 72.  Later, the victim again tells petitioner that he raped her and he

17  responded saying, "I didn't.  Please, don't say that."  Id. at 74.

18        Over a month later, however, petitioner made incriminating statements during a phone

19  conversation with Detective Bernacchi.  Petitioner stated that the victim was "a little more drunk"

20  than he was.  Id. at 81.  He also stated that she passed out in his room but he "coulda swore she

21  was just fakin it" and that she seemed to be awake.  Id.  He told the Detective that the victim said

22  "no Joe, no" while he was taking off her clothes but that she was "cracking . . . little smiles" and

23  repositioning herself provocatively.  Id. at 82-83.  Subsequently, when he was asked whether he

24  had spoken with the victim since the morning after the incident, petitioner said:

25            Yes.  She – she called me. . . she asked me . . . what made me think
              it was okay . . . and I pretty much told her . . . some of the things I
26

27  [4]  There were two "pretext" phone calls between the victim and petitioner that were initiated by
     the victim at the behest of the police.  Petitioner was unaware that the calls were recorded or
28  made at the request of the police in order to gather information.

15

told you . . . I'm pretty sure I asked her, well what you weren't awake? I mean, you – it wasn't just an act? I don't know if I said that, I think maybe I did, I'm not sure. . . and then she – she was asking me, okay what makes me think it was okay to do that and . . . she was like well it's like you raped me. I mean you raped me. I'm like holy shit and then she – she tells me that and – and then I get to thinkin about it that way and um . . . I do almost feel, you know, by definition, I mean, yeah, I feel like that's pretty much what I did.

Id. at 100-01. Soon after, petitioner said:

I mean I was honest and yeah, I mean I fuckin raped her, dude, you know what I mean? Like, down to definition. I mean . . . in my mind, you know, rape is something different, you know. I – no, no –no I – this definitely could be a form of rape, you know . . . I don't – maybe a form of date rape or wh – I don't know what ya wanna call it . . . but I could have sworn it was okay with her. I mean, yeah what she said, but then again, you know the young girl playin games, you know tellin people we're boyfriend/girlfriend.

Id. at 103-04. Subsequently, Detective Bernacchi explained to petitioner that because the victim was seemingly passed out it would be hard to say that she actually consented. Id. at 104. Petitioner responded by asking, "Even the fact that she didn't say anything once it kinda had started." Id. Petitioner then elaborated by saying, "She was moving, she was makin noise, she – I'm pretty sure I had a word, you know what I mean, like somethin." Id.

It is clear that petitioner's perceptions of his actions on the night in question changed between the pretext calls with the victim and his conversation with Detective Bernacchi. Overall, petitioner's statements seem to indicate that at the time of the incident he may not have known that the effect of an intoxicating substance prevented the victim from resisting. Nevertheless, even if petitioner had a mistaken belief that the victim was able to consent, petitioner's statements also indicate that such a belief was not reasonable. The unreasonableness of such a belief is established by the evidence of the amount of alcohol consumed by the victim in a short period of time, the fact that she fell and required assistance mobilizing at the bar, and that she passed out in petitioner's room. Furthermore, petitioner was aware of the victim's stance regarding maintaining her virginity, which would indicate that she was not exercising or capable of exercising reasonable judgment on the night in question.

/////

1    Judged by the elements defined in California law, the state appellate court could have

2    reasonably determined that the jury could have concluded that effect of an intoxicating substance

3    prevented the victim from resisting and petitioner knew or reasonably should have known that

4    was the case.  Thus, petitioner's claim that insufficient evidence supported his conviction is

5    denied.

6    **B.  Ineffective Assistance of Counsel**

7    Petitioner claims that he was denied his Sixth Amendment right to the effective assistance

8    of counsel because (1) his trial counsel failed to move to preclude admission of a statement made

9    by Detective Bernacchi and (2) his trial counsel formerly worked as a prosecutor under the

10   district attorney.

11   **1.  Failure to Move to Exclude Statement**

12   Petitioner claims that he was given ineffective assistance because his trial counsel failed to

13   move to exclude "critical damaging statements that could sway jurors to a guilty verdict."  ECF

14   No. 1 at 7.  On direct appeal, petitioner specifically indicated that his trial counsel failed to move

15   to exclude Detective Bernacchi's statement of his opinion about an intoxicated person during his

16   interview of petitioner.  Lod. Doc. No. 5 at 22-27.  Petitioner argued that the Detective was not

17   qualified to provide expert medical testimony and that his statements amounted to an inadmissible

18   legal conclusion.  Id.

19   The test for demonstrating ineffective assistance of counsel is set forth in Strickland v.

20   Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).  First, a petitioner must show

21   that, considering all the circumstances, counsel's performance fell below an objective standard of

22   reasonableness.  Strickland, 466 U.S. at 688.  To this end, the petitioner must identify the acts or

23   omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at

24   690.  The federal court must then determine whether in light of all the circumstances, the

25   identified acts or omissions were outside the wide range of professionally competent assistance.

26   Id.  "We strongly presume that counsel's conduct was within the wide range of reasonable

27   assistance, and that he exercised acceptable professional judgment in all significant decisions

28   made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir.1990), citing Strickland at 466 U.S. at 689.

1    Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at 693.

2    Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional

3    errors, the result of the proceeding would have been different.  A reasonable probability is a

4    probability sufficient to undermine confidence in the outcome."  Id.

5    In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a

6    fundamental fairness standard.  Williams v. Taylor, supra, 529 U.S. at 391-93, citing Lockhart v.

7    Fretwell, 506 U.S. 364, 113 S. Ct. 838, 122 L.Ed.2d 180 (1993).

8    The Supreme Court recently emphasized the importance of giving deference to trial

9    counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  466 U.S., at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 [ ].  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "  Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83[ ] (1955)).
>
> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398[ ].  Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843, 1852, 152 L.Ed.2d 914 (2002).

On direct appeal, the Court of Appeal noted and rejected petitioner's claim as follows:

> Finally, defendant contends that counsel rendered ineffective assistance by failing to move to exclude Detective Bernacchi's statement of his opinion about an intoxicated person during his interview of defendant.  We find no prejudice.
>
> In the tape-recorded phone conversation between Detective Bernacchi and defendant, the following was stated:
>
> "[DEFENDANT]: She was moving, she was makin' noise,

18

she—I'm pretty sure I had a word, you know what I mean, like somethin'.

"BERNACCHI: And that's why I'm not sure what's gonna happen, okay?  I understand she's movin' and that's why I'm saying, I don't know.  But there's been a—this is just in my experience, okay, uh a person who is unconscious still will have certain responses, okay, um especially if—especially if they've been drinking.  Um, and this comes from working years on the streets.  You can even—if you dealt with a person who is drunk on the street and passed out, even when you were tryin' to pick him [up] and, you know, put him in what we used to call the—the wagon to take him to a detox center, they still will verbalize certain things, but they may not remember what happened.  I mean, I had a guy take a swing at me one time.  I go, do you remember doin' that?  And the guy's like, no.  So, it's hard to say and that's why I'm being honest with you.  I don't know for sure what's gonna happen, okay?  I just collect all the facts and then I turn it over to the DA's office.  Now I'll be happy to let you know as things progress and I'll be happy to give you my phone number if you have any other questions, too."

To establish ineffective assistance of counsel, defendant must demonstrate that counsel's performance was deficient and that defendant suffered prejudice as a result.  (Strickland v. Washington (1984) 466 U.S. 668, 687-688, 691-692 [80 L.Ed.2d 674, 693, 696] (Strickland); People v. Ledesma (1987) 43 Cal.3d 171, 216-218.)

We need not determine whether counsel's performance was deficient because we can dispose of defendant's ineffectiveness claim on the ground of lack of prejudice.  (Strickland, supra, 466 U.S. at p. 697 [80 L.Ed.2d at p. 699].)  In assessing prejudice, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  (Id. at p. 695 [80 L.Ed.2d at p. 698].)  "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  (Id. at pp. 695-696

[80 L.Ed.2d at pp. 698-699].)

We find no prejudice because, as previously discussed, the evidence for rape of an intoxicated person was overwhelming.  Even assuming the detective's statements during the interview concerning his personal experience with intoxicated people on the street were objectionable, his statements were made during an interview with defendant, were not offered as an expert medical opinion at trial, and did not constitute a legal conclusion on the ultimate issue of consent, contrary to defendant's arguments otherwise.  There was no reasonable probability that the jury would have returned a more favorable verdict had the court stricken the

1    detective's statements on counsel's motion.

2    Martinez, 2011 WL 2892002 at *15-18; ECF No. 12, 31-32.

3        Admission of the statement should have been the subject of objection, or at the very least

4    a request for a limiting instruction. Without any guidance, the jury would not have any reason not

5    to simply accept as fact what the detective said. But, as discussed by the Court of Appeal,

6    petitioner's claim lacks merit because he is unable to show prejudice pertaining to the conviction

7    for rape of an intoxicated person. Detective Bernachhi's statements concerning whether an

8    unconscious individual is able to make articulations or voluntary movements have little effect on

9    the analysis for rape of an intoxicated person. As noted by the Court of Appeals, there was ample

10   evidence supporting petitioner's conviction of that crime. The court concluded that there was not

11   a reasonable probability that had the Detective's statements been excluded the result of the

12   proceeding would have been different after noting that the statements were not offered as an

13   expert opinion.

14       The Court of Appeals did not apply Strickland in an objectively unreasonable manner.

15   See Bell, 535 U.S. at 699, 122 S. Ct. 1843. Therefore, petitioner's claim of ineffective assistance

16   is denied.

17       **2. Conflict of Interest**

18       Petitioner claims that his trial counsel had an impermissible conflict of interest due to his

19   previous position as a prosecutor, which violated petitioner's Sixth Amendment right to effective

20   assistance of counsel. ECF No. 1, 8. Respondent argues that this claim is unexhausted because it

21   was not presented to the California Supreme Court for either direct or state collateral review.

22   ECF No. 12, 24. Therefore, respondent asserts that petitioner cannot receive relief based on this

23   claim. See 28 U.S.C. § 2254(b)(1)(A). Alternatively, respondent argues that the claim should be

24   denied on its merits because it is not colorable because it lacks legal and factual support. ECF

25   No. 1, 8. Although generally a writ of habeas corpus may not be granted unless the petitioner has

26   exhausted the remedies available in the courts of the State, a federal court has the power to deny

27   an unexhausted habeas claim on the merits. 28 U.S.C. § 2254(b); Granberry v. Greer, 481 U.S.

28   129, 107 S. Ct. 1671, (1987).

1   The Supreme Court has held that a criminal defendant has a constitutional right to

2   assistance of conflict-free counsel.  Strickland, 466 U.S. at 688, 104 S. Ct. 2052.  To establish a

3   Sixth Amendment violation based on a conflict of interest, Petitioner must show: (1) that his trial

4   counsel actively represented conflicting interests, and (2) that an actual conflict of interest

5   adversely affected his performance.  Mannhalt v. Reed, 847 F.2d 576, 579-80 (9th Cir. 1988),

6   citing Cuyler v. Sullivan, 446 U.S. 335, 348, 350 (1980).  "[A]n actual conflict of interest means

7   precisely a conflict that affected counsel's performance—as opposed to a mere theoretical

8   division of loyalties."  Mickens v. Taylor, 535 U.S. 162, 171, 122 S. Ct. 1237 (2002).  Petitioner

9   does not state why the asserted conflict adversely affected his lawyer's work.  Nor does he

10   attempt to show that had counsel not been adversely impacted by the conflict, the outcome of his

11   trial may well have been different.  Because a "mere possibility of a conflict of interest is

12   insufficient to support a holding of ineffective assistance," petitioner's claim must be denied.

13   **IV.  Request for Counsel**

14   Petitioner has requested the appointment of counsel.  ECF No. 1, 15.  There currently

15   exists no absolute right to appointment of counsel in habeas proceedings.  See Nevius v. Sumner,

16   105 F.3d 453, 460 (9th Cir. 1996).  However, 18 U.S.C. § 3006A authorizes the appointment of

17   counsel at any stage of the case "if the interests of justice so require."  See Rule 8(c), Fed. R.

18   Governing § 2254 Cases.  In the present case, the court does not find that the interests of justice

19   would be served by the appointment of counsel on petitioner's behalf.

20   **V.  Conclusion**

21   Accordingly, IT IS HEREBY ORDERED that petitioner's January 1, 2013 petition for

22   writ of habeas corpus and request for appointment of counsel (ECF No. 1) is DENIED.

23   Dated: January 9, 2013

24                                              /s/ Gregory G. Hollows

25                                       UNITED STATES MAGISTRATE JUDGE

26

27   GGH: 33 mart0003.hc.ord

28

21